78

1          DEPUTY COMMISSIONER FILANGERI:  -- Uzis

2    work.

3          INMATE SUEGA:  -- is not all that -- it

4    wasn't all that new in a sense out on the streets,

5    and like I said, I've been to carnivals where you

6    have BB guns that shoot out repetitively to shoot

7    out a star or something for a prize.

8          DEPUTY COMMISSIONER FILANGERI:  And you're

9    not telling me that this thing worked like the BB

10   gun in the carnival, are you?

11         INMATE SUEGA:  It has the same idea.

12         DEPUTY COMMISSIONER FILANGERI:  You pull the

13   trigger to make it go.

14         INMATE SUEGA:  Pull the trigger and it

15   fires.

16         DEPUTY COMMISSIONER FILANGERI:  Yeah, but --

17         INMATE SUEGA:  And you aim.

18         DEPUTY COMMISSIONER FILANGERI:  All right.

19   Okay.  That's all the questions I have.  Thanks.

20         PRESIDING COMMISSIONER ENG:  Okay.  Mr.

21   Jacobs, do you have any questions that you would

22   like to pose to the inmate?

23         DEPUTY DISTRICT ATTORNEY JACOBS:  Yes, one

24   or two.  The inmate said that he was a member of

25   the Waterfront Piru and he was in a car with

26   members of West Side Wilmas.  Did those two gangs

27   get along?

79

1          PRESIDING COMMISSIONER ENG:  Sir, respond to

2     the panel.

3          INMATE SUEGA:  Then, back then it wasn't --

4     you know, everyone -- it was the same neighborhood

5     of different gangs, so everybody got along back

6     then.

7     Now --

8          PRESIDING COMMISSIONER ENG:  Back then.  So

9     those gangs did get along?

10         INMATE SUEGA:  Yes, back then, back in the

11    '80s --

12         PRESIDING COMMISSIONER ENG:  Okay.

13         INMATE SUEGA:  -- early '80s.

14         PRESIDING COMMISSIONER ENG:  Okay.  Mr.

15    Jacobs?

16         DEPUTY DISTRICT ATTORNEY JACOBS:  Yes.

17    Westside Wilmas, that's primarily a Latino gang;

18    is that correct?

19         INMATE SUEGA:  Yes.

20         PRESIDING COMMISSIONER ENG:  Is that true?

21         INMATE SUEGA:  Yes.

22         PRESIDING COMMISSIONER ENG:  It is?  Okay.

23    Yes.

24         DEPUTY DISTRICT ATTORNEY JACOBS:  And the

25    Waterfront Pirus, they're primarily a Blood gang;

26    is that correct?

27         INMATE SUEGA:  Yes.

80

1          **DEPUTY DISTRICT ATTORNEY JACOBS:**  I have

2     nothing further.

3          **PRESIDING COMMISSIONER ENG:**  Okay.  Do you

4     have any, Counselor, questions for your client?

5          **ATTORNEY STRINGER:**  I do.  Thank you,

6     Commissioner.  Mr. Suega, if you were given a

7     parole date and the Board imposed a number of

8     conditions upon you, that you attend AA, perhaps

9     you go to a halfway house, acquire a sponsor,

10    submit to drug testing, would you comply with each

11    and every one of those conditions?

12         **INMATE SUEGA:**  Yes, to the letter.

13         **ATTORNEY STRINGER:**  And in the Squires

14    program have you personally been able to reach or

15    help some youth?

16         **INMATE SUEGA:**  Yes.

17         **ATTORNEY STRINGER:**  And do you feel you made

18    a difference in that program?

19         **INMATE SUEGA:**  Yes.

20         **ATTORNEY STRINGER:**  And that's a volunteer

21    program?

22         **INMATE SUEGA:**  Yes.

23         **ATTORNEY STRINGER:**  Going back for a moment

24    to some of the Commissioner's questions.  If I was

25    to tell you that two youngsters were injured and a

26    person lost his life simply because somebody threw

27    a bottle, how does that affect you now?  What do

81

1    you think of that?

2          INMATE SUEGA:  It's tragic, in a sense,

3    horrendous.  I mean, how could something so small

4    end up with a life being lost?

5          ATTORNEY STRINGER:  Do you realize the

6    magnitude of that?

7          INMATE SUEGA:  Yes.  A man died.

8          ATTORNEY STRINGER:  And do you have remorse

9    for that?

10          INMATE SUEGA:  Yes, deeply.

11          ATTORNEY STRINGER:  And there are a lot of

12    people out on the yard that are called, for lack

13    of a better term, shot-callers.  They tell people,

14    "You do this, you do that," and sometimes they

15    tell people to go and injure somebody else.

16          INMATE SUEGA:  Uh-huh.

17          ATTORNEY STRINGER:  How are you not a person

18    that they could say go out and do something to

19    this person, or do something to that person?  How

20    have you grown to where you would not do that now?

21          INMATE SUEGA:  I mean, I'm no longer that

22    17-year-old impressionable kid that was used then.

23    I'm 35 years old, and as a man, growing up.  Even

24    in prison I can stand on my own two feet and say,

25    you know, that my life and my family's life is

26    more important to me, you know, now and in the

27    future, than being accepted by, you know, a group

82

1    of people that really didn't care about me.

2        **ATTORNEY STRINGER:**  Thank you.  Thank you,

3    Commissioner.

4        **PRESIDING COMMISSIONER ENG:**  Okay.  We're

5    going to move on to closing statements.  Mr.

6    Jacobs?

7        **DEPUTY DISTRICT ATTORNEY JACOBS:**  Thank you.

8    The position of the Los Angeles District

9    Attorney's Office is that the prisoner still

10   represents a danger to the community and shouldn't

11   be released based on two areas.  One, the prisoner

12   still blames his offense on alcohol intoxication,

13   that he had not dealt seriously with that problem,

14   and two, his parole plans are poorly thought out

15   and offer no prospect for employment.  In regards

16   to one, the prisoner contends he was either drunk

17   or intoxicated at the time he shot the Uzi through

18   the VFW Hall door, and most the clinicians offer

19   this as a valid excuse for his extremely poor

20   judgment.  I suppose that for the fact that the

21   prisoner was intoxicated, there would've been no

22   firing of the Uzi.  The prisoner first enrolled in

23   AA in 1995, about five years after arrival at CDC,

24   which is earlier than most inmates, however, he

25   has not seriously pursued that endeavor over the

26   years that he has been incarcerated, and at best

27   count, taken from the Post-Conviction Progress

83

1    Reports and the Board Reports, I show 43 months of

2    AA and 24 months of NA.  Most of the NA was taken

3    in a time frame concurrent with the AA, but for

4    purposes of making a point, I'll add the two

5    together to equal 67 months.  The prisoner has

6    been in CDC for 16 years, or roughly 92 -- 192

7    months.  Therefore, the prisoner's participation

8    in AA and NA has been about 35 percent of his

9    total stay.  I'm very familiar with AA, NA and CA,

10   and that being Cocaine Anonymous.  I've attended

11   their meetings and group sessions, I listened to

12   the speakers from the other bar and seminars which

13   are mandated by the state of California.  What I

14   have learned from all this is that once you're an

15   alcoholic or addict, you will always remain one

16   for the rest of your life.  There appears to be a

17   genetic disposition towards addiction, which

18   although it does not necessarily lead one to the

19   intoxicant, once the person has found his way

20   there, the genetic predisposition encourages him

21   to remain there.  That is why it's now being

22   referred to as a disease.  The predisposition can

23   be overcome but it requires self-discipline and a

24   firm will to do so.  AA/NA meetings are usually

25   attended once a week.  A new recruit may even

26   attend every day until he gets his demons under

27   control.  The strong-willed individual may cut

84

1  back to once or twice a month, but they will

2  always have a sponsor that they can talk to in

3  case of an emergency, but these people in a free

4  society.  They see the beer commercials every day,

5  they can smell the odor of alcohol on their boss's

6  breath after lunch, and they can obtain a drink

7  for the mere price of a dollar.  The prisoner is

8  not in that position.  There are no bars in San

9  Quentin except the ones on the cell door.  There

10 might be some pruno, but the taste is foul and the

11 punishment is stiff if you get caught with it.  If

12 the prisoner approaches AA/NA in a half-hearted

13 manner -- in the half-hearted manner in prison,

14 how serious is he going to be if he's out in the

15 free world and he is only required to do so by his

16 parole officer? He is single.  What if a lady

17 friend says, "Let's stop for a drink"?  When I see

18 the prisoner attend AA with the same frequency as

19 I see an alcoholic in the free world attend, I

20 cannot believe that he has licked his habit.  I've

21 seen stronger-willed people than the prisoner fall

22 off the wagon and lose everything.  One senior

23 deputy sheriff, who was a friend of mine, couldn't

24 turn loose of the bottle.  He is now working as a

25 security guard.  Every psych report conditions the

26 opinion of the prisoner's dangerousness upon his

27 abstinence from alcohol and drugs.  As Dr. Francis

85

1  stated in his 2002 psych, the current substance

2  abuse would impose an enormous risk for the

3  prisoner and for society, and just to point out

4  that his attendance of AA, it has been sporadic.

5  The most attended has been six months during a

6  year's period of time in AA slash NA.  The

7  prisoner's current parole plans are to live with a

8  girl named Liza in San Pedro, with a fallback

9  residence with his cousin, Pete in Wilmington.

10 The prisoner is apparently planning on moving back

11 to the neighborhood where the life crime occurred.

12 In that neighborhood are his old friends from the

13 Waterfront Piru and Westside Wilmas, Wilmas being

14 Wilmington, plus the people who used to supply him

15 with the drugs he sold.  The prisoner has not one

16 employment offer in California, so if we add the

17 geographical area where the prisoner plans to live

18 with the lack of an adequate income to support

19 himself, the temptation would be great to sell

20 drugs again.  The prisoner says he would like to

21 work in the building trades, but if he thinks that

22 someone is going to hand him a building trades job

23 because of his training, he's sadly mistaken.  All

24 the heavy labor construction jobs are now mainly

25 being held by illegal aliens, and that's from my

26 own experience.  This includes dry-wallers,

27 roofers, framers, cementers and similar trades.

86

1    Not affected are the skilled trades, such as

2    plumbing and electrical, but it took my kid three

3    years of working at a nonunion electrical job

4    before he got his foot in the door and was

5    accepted as apprentice by the IBEW, and he got his

6    nonunion electrical job through friends who were

7    already in the trade.  Any union steward will tell

8    you, you can't be a member of the union until

9    you're employed by a union contractor, and the

10   union contractor will not hire you until you're a

11   member of the union, and I believe that's what's

12   called a Catch 22.  As Dr. Payne observed in the

13   1999 psych report, that significant risk factors

14   would be not having viable employment, which could

15   lead the prisoner back to selling drugs to support

16   himself.  I do not see at this point in time that

17   the prisoner is prepared for parole either through

18   employment offers or through fact that he has just

19   really not approached his alcoholism seriously.

20   And again, until he approaches it in the same

21   manner as an alcoholic would do it out on the

22   street in free society, I don't think he's ready.

23   Submit it.

24           **PRESIDING COMMISSIONER ENG:**  Thank you.  Mr.

25   Stringer, closing statement?

26           **ATTORNEY STRINGER:**  Thank you, Commissioner.

27   The standard the Board must use is whether or not

87

1   my client, as he sits before you now, poses an

2   unreasonable risk of danger to society or a threat

3   to public safety, and the answer to that, you must

4   again go to the experts.  I think it's worth

5   pointing out that my client, although coming from

6   a troubled background and obviously being a youth

7   in some distress, has now found the wonderful

8   vocation of education and is now pursuing that

9   with a real passion.  The Board Report indicates

10  that Mr. Suega has expressed that he would

11  continue his pursuit of his AA degree to follow

12  with the completion of his BA in Sociology.  So he

13  is very, very earnest in his support of higher

14  education, and certainly would attempt to continue

15  that pursuit upon a grant of parole.  The

16  counselor also indicates that this pursuit and

17  this initiative is, to use the counselor's words,

18  overwhelming to further his education.  Now even

19  though he has this initiative, he's also taken

20  time to involve himself in the Squires program,

21  and that, as we know, is an excellent program at

22  San Quentin that helps troubled youth, and what

23  better person to talk to troubled youth than the

24  person that has come out of the gang environment,

25  knows what it is to be a follower, knows what it

26  is to be a young person in pursuit of a group, a

27  group of individuals that he thinks cares for them

88

1  and are going to support him, but as he, in his

2  own words says, are in fact just using him and

3  couldn't care a whit about what happens to him, as

4  I'm sure he realizes now as he sits before you in

5  blue.  So what better person to talk to these

6  young people?  He doesn't have to do that, but yet

7  he does, and I think that shows real growth on the

8  part of my client.  In Dr. Inaba's most recent

9  psychological evaluation, dated May 22nd of '06,

10  the doctor indicates that my client doesn't

11  possess any of the dynamic risk factors that would

12  lead to any type of violent recidivism.  She also

13  says that he has an exceptional ability for

14  academic work.  Additionally, she talks about the

15  fact that an early age his gang membership gave

16  him both an identity and a sense of belonging.

17  He's addressed that today, he's indicated how he

18  has matured in that area, and I think his behavior

19  in prison shows he hasn't been affiliated with any

20  gangs, he hasn't been on the periphery of any --

21        DEPUTY COMMISSIONER FILANGERI:  Excuse me,

22  please.

23            [Thereupon, a new tape was begun.]

24        DEPUTY COMMISSIONER FILANGERI:  We're on

25  tape two of the parole consideration hearing

26  transcript for Mr. Harrison Suega, S-E-U-G-A, E

27  like Edward, 46750.  Sorry for the interruption.

89

1    Go ahead, Counsel.

2         **ATTORNEY STRINGER:** Thank you.  My client is

3    no longer a follower or a gang member, or has any

4    inkling at all to be involved with that type of

5    lifestyle.  He's not on the periphery of any

6    gangs, he's not affiliated with any gangs, in fact

7    he eschews all gangs, and certainly that is borne

8    out again in the fact that he volunteers for the

9    Squires program, because these are street kids.

10   In an instant they would know if my client wasn't

11   sincere in telling them, as they say, like it is.

12   Now it's a matter of contention, of course, but

13   the doctor indicates, quote:

14            "There is no evidence that my client

15            or his companions knew or intended to

16            harm any of the victims.  It would

17            seem that the firing the weapon

18            through the door was an impulsive act

19            of aggression and intimidation that

20            tragically resulted in the death of

21            one person and injury to two young

22            people."

23   Now Mr. Suega has addressed that today, and talked

24   about the fact that he knew where the gun was, he

25   put the gun in his hand, he did what we used to

26   call cock the gun, and obviously resulted in a

27   round going into the chamber, and the gun was

90

1   obviously an automatic and fired 11 rounds into

2   the door, and we all know what happened.  So I do

3   think that the questions of the panel showed that

4   Mr. Suega does have insight into why this

5   occurred, how it occurred, and what his role was,

6   remembering that he was just a youngster at the

7   time himself.  The doctor also indicates if given

8   enough resources and support, he's an individual

9   who could end up as a highly functional member of

10   society.  He has the intelligence and awareness to

11   make valued contributions understanding at-risk

12   youth.  Given that my client is unlikely to commit

13   further acts of violence, the most tragic outcome

14   in this case would be to have another life, Mr.

15   Suega's, sacrificed to abuse and violence.  In

16   many ways Mr. Suega's an exceptional individual

17   who is capable of making a significant

18   contribution to his family and society.  The most

19   direct route for him to move closer to that goal

20   would be participation in therapeutic community

21   programs such as Delancey Street.  He also -- or

22   the doctor also indicates his parole plans are

23   realistic.  In light of his efforts at

24   self-understanding and growth, he would seem to be

25   at low risk for future violence.  She also talks

26   about abstinence and participation in twelve step

27   programs.  With the stipulation that abstinence

91

1   and participation in twelve step programs should

2   be ongoing, Mr. Suega would make an excellent

3   candidate for parole consideration at the present

4   time.  He is not in need of further therapy in

5   order to return successfully to the community.

6   Now those individuals that know him and have

7   worked with him, such as Dr. Gary Menendez, state,

8   quote:

9           "Harrison has shown a conviction

10          towards the objectives of the Trust

11          program.  He's demonstrated he

12          understands the gravity of the damage

13          caused to the community by his actions

14          so long ago, and that he is determined

15          to join his support base in the

16          community.  I believe that he is well

17          prepared to rejoin society, and I urge

18          the Board of Parole Hearings to find

19          him suitable for parole."

20  This opinion is also echoed by Elaine Leeder, who

21  is an MSW, CSW, MPH and Ph.D., a professor of

22  Sociology, and the dean of the School of Social

23  Science at Sonoma State University.  Dr. Leeder

24  says:

25          "I've also had a number of private

26          conversations with Mr. Suega in which

27          I believe I have come to know him

92

1    quite well.  He is a sane and

2    thoughtful person who has thought

3    through his life experiences and has

4    made dramatic and significant changes

5    in his life.  He's a hard-working

6    student, a committed community member,

7    and a voice of reason in a very

8    chaotic environment.  He's made

9    dramatic changes in overcoming his

10   early life problems, and I believe him

11   to be an excellent candidate for

12   parole."

13   Mr. Suega does have viable residence plans.  He

14   has marketable skills within the meaning of

15   Section 2402(d)(8) of Title 15.  He has skills in

16   Paralegal, Masonry and other trade skills.  He

17   also, as I said, working towards his AA degree.

18   He has an extended and loving family not only in

19   the United States but also abroad, and certainly

20   the Board under its current rules does have the

21   ability to parole him to another state, or

22   possibly to another country.  So finally the

23   question of AA.  Will Mr. Suega remain sober?

24   Certainly if he was given a parole date, his agent

25   could require that he attend, and the rule is for

26   AA, 90 meetings in 90 days.  Certainly he could go

27   to those meetings, report to his agent on a daily

93

1    basis.  His agent could require that he go to

2    Walden House.  Delancey Street deals with this.

3    There are several programs that deal with this.

4    He could either go in as an outpatient or go in as

5    a resident patient in order to transition.  There

6    are many avenues that can address this particular

7    problem.  He could be randomly tested on a daily

8    basis.  So the state of California would have no

9    concern that Mr. Suega was in a viable AA program.

10   But as everybody knows that has had any connection

11   with AA, it's how you work the steps.  It's

12   whether or not you realize that alcohol has become

13   an unmanageable part of your life and you can

14   never drink again, and that isn't something that

15   you attain by going to meetings every day.  That

16   helps, but it's something you attain by working

17   the steps and acquiring a sponsor, and those

18   questions were never asked of him here at the

19   Board, but I'm certain he will tell you that he

20   knows that and wants to do that.  Nobody can ever

21   determine whether a person that's an alcoholic

22   will drink again, but you can put those tools in

23   place that will support them and assist them, and

24   the Parole Department does have the ability to do

25   that.  So as a result, I would ask the Board to

26   seriously consider my client for a date since in

27   my view he does not pose an unreasonable risk of

94

1    danger to society or a threat to public safety.

2    Thank you.

3        **PRESIDING COMMISSIONER ENG:** Okay.  Sir,

4    this is your chance, if you choose to, to present

5    a final statement to the panel on your parole

6    suitability.

7        **INMATE SUEGA:** Yes.  Well, as I said

8    earlier, it was 1989, January 24th, 1989.  It was

9    never a question of whether I was guilty for the

10   murder of Mr. David Ryan, and the injuries that I

11   caused Miss Priscilla Perez and Louis Cortez.  You

12   know, I knew I was guilty and I knew I had to

13   accept responsibility, and I accepted

14   responsibility then, and I accept responsibility

15   now, and, you know, that is reflected on what I

16   have done to get to the point, you know, to where

17   I'm at now, mentally as well spiritually, and it

18   was a transition that was difficult, you know,

19   prison is a stressful environment, but I live

20   beyond that, you know, I focused beyond that to

21   better myself in a sense, and you know, I've lived

22   that day, you know, often, every day of my life,

23   and I wish there were a lot of things that I

24   could've done differently, and yet, you know, the

25   reality is that I can't undo the past, I can't

26   undo what I've done, you know, since the age of

27   13, and all the way to the age of 17, but what I

95

1  can undo is the moral fiber, the negative values

2  that I adopted at the time and functioned under,

3  and made, and based my behavior and decisions on,

4  and so that, I can change, and that, I have

5  changed, and I could say that I'm, you know, I'm

6  ready to be paroled, and I hope that you find me

7  suitable, because I am ready to be paroled and

8  wouldn't go back to alcohol or drugs, or find

9  myself in a situation that I was in.  With that,

10  you know, I would thank all of you for your time

11  and patience in hearing and ask that, you know,

12  again, I be honest consideration for suitability

13  hearing.  Thank you.

14        **PRESIDING COMMISSIONER ENG:**  Okay.  Thank

15  you.  We'll now recess.  The time is six p.m.

16              **R E C E S S**

17              --o0o--

18

19

20

21

22

23

24

25

26

27

96

1          CALIFORNIA BOARD OF PAROLE HEARINGS

2                  D E C I S I O N

3          **PRESIDING COMMISSIONER ENG:**  Are we on the

4    record?

5          **DEPUTY COMMISSIONER FILANGERI:**  Uh-huh.

6          **PRESIDING COMMISSIONER ENG:**  Oh, okay.  All

7    right.  The time is now 6:22.  In the matter of --

8    I hear the feedback -- Harrison -- I'm sorry, I

9    apologize for the name, pronounced Suega?

10         **INMATE SUEGA:**  Suega.

11         **PRESIDING COMMISSIONER ENG:**  Suega?

12         **INMATE SUEGA:**  Suega.

13         **PRESIDING COMMISSIONER ENG:**  Suega.  The

14   panel -- oh, I have to note that everyone who was

15   in the room prior to our recess for deliberations

16   has since returned.  So the panel has reviewed all

17   the information received and relied on the

18   following circumstances in concluding that the

19   prisoner is not suitable for parole and would pose

20   an unreasonable risk of danger to society or a

21   threat to public safety if released from prison.

22   The commitment offense was carried out in an

23   especially cruel and/or callous manner.  There

24   were multiple victims that were attacked, injured,

25   and/or killed in the same incident.  The offense

26   was carried out in a dispassionate manner, it was

27   HARRISON SUEGA    E-46750    DECISION PAGE 1    11/30/06

97

1    carried out in a manner which demonstrates an

2    exceptionally callous disregard for human

3    suffering, and the motive for the crime was

4    inexplicable or very trivial in relation to the

5    offense, and these conclusions are drawn from the

6    Statement of Facts wherein the prisoner was

7    apparently the only one armed with a weapon, a

8    deadly weapon, it turned out to be an Uzi, and

9    succumbed to peer pressure, it appears, by your

10   fellow gang member yelling, "Shoot at the door.

11   Shoot at the door," and without thinking, you just

12   went ahead and ended up killing a man --

13          INMATE SUEGA:  Uh-huh.

14          PRESIDING COMMISSIONER ENG:   -- injuring

15   another person, and injuring a five-year-old girl

16   in the commission of that crime, so again, there

17   were multiple victims, and then basically

18   everybody took off. And again, the motive, I

19   cannot figure out what the motive was in terms of

20   doing that shooting. The prisoner has a pattern

21   of criminal conduct that dates back to when you

22   were a juvenile, and most of your juvenile arrests

23   and charges, as well as your arrests and charges

24   leading up to the life crime were pretty much all

25   drug related. The inmate has failed previous

26   grants of probation, specifically juvenile

27   HARRISON SUEGA    E-46750    DECISION PAGE 2    11/30/06

98

1    probation, and failed to profit from society's

2    attempts to correct your criminality, and all of

3    this led to -- up to the life crime.  Regarding

4    your institutional behavior, we feel that the

5    inmate has programmed in a somewhat limited manner

6    while incarcerated, mainly because the panel feels

7    that more programming is needed for the inmate to

8    really come to grips with the causative factors

9    leading to the life crime.

10         **INMATE SUEGA:**  Uh-huh.

11         **PRESIDING COMMISSIONER ENG:**  Okay.  And

12    you've upgraded -- limited upgrading of

13    vocational.  In terms of misconduct while

14    incarcerated includes -- I got a list, five 128a,

15    the last one being in 1997, which is refusing to

16    report to work, and two 115 disciplinary reports,

17    the last one being in 1994 for force and violence.

18    The psychological report dated May 22nd, 2006,

19    authored by Dr. Inaba, I-N-A-B-A, was supportive.

20    Regarding your parole plans, sir, the panel feels

21    that they're not strong enough.  You do have some

22    residential offers, however, be sure that you have

23    as current letters as possible --

24         **INMATE SUEGA:**  Uh-huh.

25         **PRESIDING COMMISSIONER ENG:**  -- and that

26    within those letters there is an address clearly

27    HARRISON SUEGA    E-46750    DECISION PAGE 3    11/30/06

1   stated on the letter, the date, and not only that,

2   but very specifically spells out what they are

3   offering to you.  If you have people who are

4   offering a roof over your head, get as detailed as

5   possible, what does that mean.  Does that mean

6   you're going to be sleeping on the floor

7   indefinitely?  Also, if they're offering financial

8   support, what type of financial support are they

9   offering?  Are they offering you, you know,

10  medical help, are they offering your

11  transportation, etcetera, okay?  The more

12  information that you can provide, the more solid

13  the plan is.

14          INMATE SUEGA:  Uh-huh.

15          PRESIDING COMMISSIONER ENG:  Does that make

16  sense to you?  Okay.  Also regarding employment

17  plans, were really nonexistent.  And again, the

18  panel understands how difficult it is to get any

19  type of job offers, letters of offers, while

20  you're incarcerated.  However, as I stated before

21  to you, any and all documentation of your level of

22  effort in terms of reaching out and looking at all

23  your different alternatives, keeping some type of

24  record of it, and presenting that to the panel,

25  documentation of what you're doing.

26          INMATE SUEGA:  Uh-huh.

27  HARRISON SUEGA    E-46750    DECISION PAGE 4    11/30/06

100

1       **PRESIDING COMMISSIONER ENG:**  Regarding 3042

2     responses, we note that the District Attorney's

3     representative from Los Angeles County was --

4     stated their opposition to parole at this time.

5     The panel makes the following findings: that the

6     inmate needs, again, additional programming in

7     order to face, discuss, understand and cope with

8     stress in a nondestructive manner.  Until progress

9     is made, the inmate continues to be unpredictable

10    and a threat to others.  Nevertheless, we feel

11    that the inmate should be commended for

12    participation in the Squires program, the Trust

13    program, being disciplinary free for the past 12

14    years.  I believe you have also obtained your

15    Masonry vocation, and your work also in Dry

16    Cleaning, and you're currently working on the

17    Plumbing.  However, these positive aspects of his

18    behavior do not outweigh the factors of

19    unsuitability.  In a separate decision the hearing

20    panel finds that it is not reasonable to expect

21    that parole would be granted at a hearing during

22    the following two years, and the specific reasons

23    for the finding are as follows.  Again, the

24    prisoner committed the offense in an especially

25    cruel manner.  You blindly shot into a door with

26    an Uzi weapon without any thought about what or

27    HARRISON SUEGA    E-46750    DECISION PAGE 5    11/30/06

101

1   who you could be hitting or hurting.  As it turns

2   out, multiple victims were attacked, injured, and

3   one of which ended up dying.  It was carried out

4   in a very dispassionate manner and was carried out

5   in a manner that demonstrates an exceptionally

6   callous disregard for human suffering, and again,

7   the motive for the crime is inexplicable or

8   trivial in relation to the offense, and you've got

9   somewhat of a history of unstable relationship

10  with others and just -- that's inherent in the

11  fact that you were a gang -- you were sort of a

12  member of one gang and trying to get accepted by

13  another gang.  We feel that the prisoner has not

14  completed the necessary programming which is

15  essential to his adjustment and needs additional

16  time to gain such programming.  This is very

17  important, and this goes back to what Commissioner

18  -- my fellow Commissioner was alluding to during

19  -- when he was asking you questions.  The panel

20  believes that the inmate needs a much greater

21  understanding of the causative factors associated

22  with the life crime.  When you get a copy of the

23  transcript, go back and read that, okay?

24        INMATE SUEGA:  Yeah.

25        PRESIDING COMMISSIONER ENG:  Therefore a

26  longer period of observation and evaluation of the

27  HARRISON SUEGA     E-46750     DECISION PAGE 6     11/30/06

102

1    prisoner is required before the Board should find

2    that the prisoner is suitable for parole.  The

3    panel recommends that you remain disciplinary

4    free, that if and when available, you upgrade more

5    vocationally.  The more that you can have

6    vocationally, the better your chances are of

7    finding employment on the outside, okay?  And if

8    available, continue to participate in any and all

9    types of self-help and programming.  I think

10    you've done well in the past.  Don't stop there.

11        INMATE SUEGA:  Uh-huh.

12        PRESIDING COMMISSIONER ENG:  Take a look at

13    everything that could be available, and not only

14    that, but write -- start writing down and bring us

15    documentation about what you got out of the

16    program and how you might be utilizing that on a

17    daily basis to change in your ways to ensure that

18    you would not fall prey, okay, to outside

19    influences again that could cause you to break the

20    law.  That basically concludes my reading of the

21    decision, and I'm going to ask Commissioner

22    Filangeri if he's got any other comments.

23        DEPUTY COMMISSIONER FILANGERI:  No, thank

24    you.

25        PRESIDING COMMISSIONER ENG:  Okay.  We wish

26    you good luck, sir.  The time is now -- what time

27    HARRISON SUEGA    E-46750    DECISION PAGE 7    11/30/06

103

1    is it?  Six thirty-two.

2                    A D J O U R N M E N T

3                        -oOo-

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23    PAROLE DENIED TWO YEARS

24    THIS DECISION WILL BE FINAL ON:_____MAR 3 0 2007_____

25    YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

26    DATE, THE DECISION IS MODIFIED.

27    HARRISON SUEGA     E-46750     DECISION PAGE 8     11/30/06

104

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, Berenice Billington, a duly designated transcriber, NORTHERN CALIFORNIA COURT REPORTERS, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total two in number and cover a total of pages numbered 1 - 103, and which recording was duly recorded at CALIFORNIA STATE PRISON, at SAN QUENTIN, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of HARRISON SUEGA, CDC No. E-46750, on NOVEMBER 30, 2006, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-mentioned matter and have no interest in the outcome of the hearing.

Dated January 31, 2007, at Sacramento County, California.

*Berenice Billington*

_____
Berenice Billington
Transcriber
**NORTHERN CALIFORNIA COURT REPORTERS**

EXHIBIT "B"

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
#### DEPT 100

| | | | |
|---|---|---|---|
| Date: | AUGUST 23, 2007 | | Deputy Clerk |
| Honorable: STEVEN R. VAN SICKLEN | Judge | JOSEPH M. PULIDO | Reporter |
| NONE | Bailiff | NONE | |

(Parties and Counsel checked if present)

BH004498
In re,
HARRISON SEUGA,
      Petitioner,

On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

Nature of Proceedings: ORDER RE: WRIT OF HABEAS CORPUS

The Court has read and considered petitioner's Writ of Habeas Corpus filed on April 5, 2007. Having independently reviewed the record, giving deference to the broad discretion of the Board of Parole Hearings ("Board") in parole matters, the Court concludes that the record contains "some evidence" to support the Board's finding that petitioner is unsuitable for parole (See Cal. Code Reg. Tit. 15, §2402; *In re Rosenkrantz* (2002) 29 Cal.4th 616, 667 (hereafter *Rosenkrantz*).)

Petitioner was received in the Department of Corrections on February 23, 1990 after a conviction for second-degree murder with use of a firearm, assault with a firearm and discharge of a firearm. He was sentenced to seventeen years to life. His minimum parole eligibility date was August 31, 2000. The record reflects that on January 21, 1989, a fight broke out in the parking lot outside of the Veterans of Foreign Wars Hall. As a security guard attempted to break up the fight, several members of the West Side Wilmas street gang arrived with bats and pipes. They beat on the door to the hall because the guard would not let them in. Petitioner, who was not a member of the gang, but was along for the ride, exited a vehicle armed with an uzi. One of his friends told him to shoot the door, at which time petitioner fired eleven rounds into the door. He killed the security guard, who was standing in front of the entrance. He also shot a five year old girl and an eighteen year old boy each in the leg.

The Board found petitioner unsuitable for parole after a parole consideration hearing held on November 30, 2006. Petitioner was denied parole for two years. The Board concluded that petitioner was unsuitable for parole and would pose an unreasonable risk of danger to society and a threat to public safety. The Board based its decision on several factors, including his commitment offense.

The record reflects that there is some evidence that the commitment offense was especially heinous because multiple victims were attacked, injured or killed in the same incident. (Cal. Code Regs., tit. 15, §2402, subd. (c)(1)(A).) Petitioner intentionally fired eleven rounds from an uzi at an occupied public building. Although only one person died as a result of the shooting, two others, including a young child, were injured. The fact that multiple victims were attacked is a factor that tends to indicate unsuitability for parole.

The Court finds that there is some evidence to support the board's finding that "the motive for the crime is inexplicable or very trivial in relation to the offense" (Cal. Code Regs., tit. 15, §2402, subd. (c)(1)(E).) "To

1

| Minutes Entered |
|---|
| 08-23-07 |
| County Clerk |

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
### DEPT 100

| | | |
|---|---|---|
| Date: AUGUST 23, 2007 | | |
| Honorable: STEVEN R. VAN SICKLEN | Judge JOSEPH M. PULIDO | Deputy Clerk |
| NONE | Bailiff NONE | Reporter |

(Parties and Counsel checked if present)

BH004498
In re,
HARRISON SEUGA,
        Petitioner,

On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

fit the regulatory description, the motive must be materially less significant (or more "trivial") than those which conventionally drive people to commit the offense in question, and therefore more indicative of a risk of danger to society if the prisoner is released than is ordinarily present." (*In re Scott* (2004) 119 Cal.App.4th 871, at 893.) In this case, it is not clear why petitioner shot and killed the victim. He stated that he wanted to be accepted by the gang members who were already engaged in the altercation. He told the Board, "They were yelling, 'Shoot the door,' and I turned to Shawn. Shawn says, 'Shoot the door,' and I shot at the door." (Reporter's Transcript, November 30, 2006, p. 14.) The Board was justified in concluding that peer pressure and the desire to fit in with gang members are materially less significant motives than those motives which conventionally drive people to commit murder, thus indicating that petitioner poses a greater risk of danger to society if released than is ordinarily present.

      Accordingly, the petition is denied.

      The court order is signed and filed this date. The clerk is directed to give notice.

      A true copy of this minute order is sent via U.S. Mail to the following parties:

Harrison Seuga
E-46750
San Quentin State Prison
San Quentin, California 94974

Department of Justice – State of California
Office of the Attorney General
Gregory J. Marcot, Deputy Attorney General
110 West A Street, Suite 1100
San Diego, California 92101

| Minutes Entered |
|---|
| 08-23-07 |
| County Clerk |

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

COURT OF APPEAL · SECOND DIST.

F I L E D

SEP 2 5 2007

JOSEPH A. LANE

Z. HERALDEZ                                    Clerk

                                        Deputy Clerk

| | |
|---|---|
| In re | B201908 |
| HARRISON SEUGA, | (Los Angeles County Super. Ct. No. A042687) (Steven Van Sicklen, Judge) |
| on | |
| Habeas Corpus. | ORDER |

BY THE COURT:

The petition for writ of habeas corpus, filed September 10, 2007, has been read and considered and is denied. (*In re Dannenberg* (2005) 34 Cal.4th 1061, 1070-1071; *In re Rosenkrantz* (2002) 29 Cal.4th 616, 676-677.)

Court of Appeal, Second Appellate District, Div. 3 - No. B201908
**S157028**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re HARRISON SUEGA on Habeas Corpus

The petition for review is denied.

SUPREME COURT
FILED

DEC 1 2 2007

Frederick K. Ohlrich Clerk

Deputy

GEORGE

Chief Justice